## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

AMANDA SISNEROS, Individually, as Mother and
Next Friend of Bryhanna Martinez and Stephen
Martinez, minors; and as Personal Representative of
the ESTATE OF DAVID SISNEROS, Deceased,

       Plaintiff,

vs.

SHAWN P. BECK, JOSEPH CORIZ, BENJIE
MONTANO, RAY SISNEROS, JR., GREG SOLANO
And THE BOARD OF COUNTY COMMISSIONERS
OF SANTA FE COUNTY, NEW MEXICO,

      Defendants.

04 FEB -9 PM 3:18

No. CIV - 0 4 - 1 ͡ ͡   ͡ ͡   ͡ PL

### NOTICE OF REMOVAL

---

The Defendants, by and through their attorneys, Herrera, Long, Pound & Komer, P.A.,

hereby give notice of removal, and state to the Court that they are named as defendants in a civil

suit which was filed in the First Judicial District Court, County of Santa Fe, State of New

Mexico, cause No. D-0101-CV-2004-00121. The said civil suit was filed in the State Court on

January 22, 2004. Pursuant to 28 USC §1446(b), this Notice is being filed within thirty (30)

days of the date the case became eligible for removal. Plaintiff in this case is Amanda Sisneros,

individually, as mother and next friend of Bryhanna Martinez and Stephen Martinez, minors; and

as Personal Representative of the Estate of David Sisneros, deceased.

### STATEMENT OF GROUNDS FOR REMOVAL

The grounds for removal are as follows:

1.    The claims against the Defendants, as expressly stated in the complaint, include

causes of action pursuant to 42 USC §1983. Accordingly, the Defendants are parties to a civil



action in which the United States District Courts have original jurisdiction founded under a claim or right arising under the laws of the United States (28 USC §1441(b)).  In addition, the civil action brought against the Defendants is one of which the District Courts of the United States have original jurisdiction (28 USC §1441(a)), and falls under 42 USC §1443(2).

2.      A copy of the Complaint is attached hereto as Exhibit A.  Pursuant to 28 USC §1441(b) and DNMLR · Civ 81(a) 1996, copies of all New Mexico District Court records of this case existing in the file from the First Judicial District Court will be filed with this Court within thirty (30) days of the filing of this notice.

HERRERA, LONG, POUND & KOMER, P.A.
*Attorneys for Defendants*

JOHN B. POUND
2200 Brothers Road
P. O. Box 5098
Santa Fe, NM  87502-5098
505-982-8405
505-982-8513 (FAX)

## CERTIFICATE OF SERVICE

I hereby certify that on this _____ day of February 2004, a true and correct copy of the foregoing Notice of Removal was mailed first class, postage prepaid, to the following counsel of record:

Robert R. Rothstein, Esq.
Rothstein, Donatelli, Hughes, Dahlstrom,
  Schoenburg & Frye, LLP
P. O. Box 8180
Santa Fe, NM  87504-8180

JOHN B. POUND

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT

No. _____

AMANDA SISNEROS, Individually, as Mother
and Next Friend of Bryhanna Martinez and
Stephen Martinez, minors; and as Personal
Representative of the ESTATE OF
DAVID SISNEROS, Deceased,

                    Plaintiff,

vs.

SHAWN P. BECK, JOSEPH CORIZ,
BENJIE MONTAÑO, RAY SISNEROS, JR.,
GREG SOLANO and THE BOARD OF
COUNTY COMMISSIONERS OF SANTA FE
COUNTY, NEW MEXICO,

                    Defendants.

## COMPLAINT FOR DAMAGES FOR DEPRIVATION OF CIVIL RIGHTS AND STATE LAW CLAIMS

COME NOW Plaintiff, by and through her counsel, below-listed, and brings the

following causes of action against Defendants pursuant to 42 U.S.C. § 1983 and the New

Mexico Tort Claims Act, NMSA 1978 §§ 41-4-1 *et seq.*:

## PARTIES

1.    Plaintiff Amanda Sisneros (hereinafter referred to as "Amanda") is now and

at all times material hereto has been a resident of Santa Fe County, New Mexico. She is

the widow of David Sisneros, deceased (hereinafter referred to as "David Sisneros"), and

has been duly appointed as the personal representative of the Estate of David Sisneros.

EXHIBIT

A

David Sisneros is also survived by his daughter, Justice Vasquez, who is currently nine years old and who resides with her mother, Marie Vasquez, in Maricopa County, Arizona. Amanda is the mother and next friend of Bryhanna Martinez, currently three years old, and Stephen Martinez, currently six years old. Bryhanna and Stephen Martinez are the step-children of David Sisneros. Amanda brings the following action individually, on behalf of the Estate of David Sisneros and as parent and next friend of Bryhanna and Stephen Martinez, minors.

2. Defendant Shawn Beck (hereinafter referred to as "Beck"), upon information and belief, was at all times material hereto a resident of Santa Fe County and/or Rio Arriba County, New Mexico. At the time of the incident complained of herein, Beck was a full-time, salaried law enforcement officer and public employee as those terms are defined in the New Mexico Tort Claims Act, NMSA 1978 §§ 41-4-3(D) and (F)(2). At all times material hereto, Beck was employed by Defendants Benjie Montaño, Ray Sisneros, Jr., Greg Solano and/or the Board of County Commissioners of Santa Fe County. At all times material hereto, Beck was acting under color of law and within the scope of his duties as a Santa Fe County Sheriff's Deputy. In connection with Plaintiff's § 1983 claims, Beck is sued in both his personal and official capacities.

3. Defendant Joseph Coriz (hereinafter referred to as "Coriz"), upon information and belief, is now and at all times material hereto has been a resident of Santa Fe County, New Mexico. At the time of the incident complained of herein, Coriz was a full-time, salaried law enforcement officer and public employee as those terms are defined

in the New Mexico Tort Claims Act, NMSA 1978 §§ 41-4-3(D) and (F)(2).  At all times material hereto, Coriz was employed by Defendants Benjie Montaño, Ray Sisneros, Jr., Greg Solano, and/or the Board of County Commissioners of Santa Fe County.  At all times material hereto, Coriz acted under color of law and within the scope of his duties as a Santa Fe County Sheriff's Deputy.  In connection with Plaintiff's § 1983 claims, Coriz is sued in both his personal and official capacities.

      4.     Defendant Benjie Montaño (hereinafter referred to as "Montaño"), upon information and belief, is now and at all times material hereto has been a resident of Santa Fe County, New Mexico.  From January 1, 1995 to December 31, 2002, Montaño served as the duly-elected Sheriff of Santa Fe County.  At such times, Montaño was a full-time, salaried law enforcement officer and public employee as those terms are defined in the New Mexico Tort Claims Act, NMSA 1978 §§ 41-4-3(D) and (F)(2).  At those times, Montaño acted under color of law and within the scope of his duties as the Santa Fe County Sheriff.  At those times, Montaño was the supervisor of Beck and Coriz.  At those times, Montaño was the final decision-maker and policy-maker for the Santa Fe County Sheriff's Department and for the County of Santa Fe in regard to law enforcement matters. In connection with Plaintiff's §1983 claims, Montaño is sued in both his personal and official capacities.

      5.     Defendant Ray Sisneros, Jr. (hereinafter referred to as "Ray Sisneros"), upon information and belief, is now and at all times material hereto has been a resident of Santa Fe County, New Mexico.  From January 1, 1999 to December 31, 2002, Ray

Sisneros served as the duly-elected Sheriff of Santa Fe County. At such times, Ray Sisneros was a full-time, salaried law enforcement officer and public employee as those terms are defined in the New Mexico Tort Claims Act, NMSA 1978 §§ 41-4-3(D) and (F)(2). At those times, Ray Sisneros acted under color of law and within the scope of his duties as the Santa Fe County Sheriff. At those times, Ray Sisneros was the supervisor of Beck and Coriz. At those times, Ray Sisneros was the final decision-maker and policy-maker for the Santa Fe County Sheriff's Department and for the County of Santa Fe in regard to law enforcement matters. In connection with Plaintiff's § 1983 claims, Ray Sisneros is sued in both his personal and official capacities.

6.      Defendant Greg Solano (hereinafter referred to as "Solano"), upon information and belief, is now and at all times material hereto has been a resident of Santa Fe County, New Mexico. From January 1, 2003 until the present, Solano has been the duly-elected Sheriff of Santa Fe County. Solano is a full-time, salaried law enforcement officer and public employee as those terms are defined in the New Mexico Tort Claims Act, NMSA 1978 §§41-5-3(D) and (F)(2). Solano is acting under the color of law and within the scope of his duties as the Santa Fe County Sheriff. Solano was the supervisor of Beck (until his termination) and Coriz. Solano is the final decision-maker and policy-maker for the Santa Fe County Sheriff's Department and for the County of Santa Fe in regard to law enforcement matters. In connection with Plaintiff's § 1983 claims, Solano is sued in both his personal and official capacities.

7.      Defendant Board of County Commissioners of Santa Fe County (hereinafter

-4-

referred to as "Santa Fe County") is a statutorily-created body politic and corporate within the State of New Mexico.  Pursuant to NMSA 1978 § 4-46-1, all suits or proceedings by or against the County shall be brought in the name of the board of county commissioners of the county.  Santa Fe County is a governmental entity and local public body as those terms are defined in the New Mexico Tort Claims Act, NMSA 1978 §§ 41-4-3(B) and (C).  At all times material hereto, Santa Fe County was the employer of Beck and Coriz.  During their terms as Sheriff, Montaño and Ray Sisneros were employees of Santa Fe County.

## JURISDICTION AND VENUE

8.     All of the material acts and/or omissions complained of herein occurred in Santa Fe County, New Mexico.

9.     This Court has original concurrent jurisdiction over Plaintiff's federal claims pursuant to **Martinez vs. California**, 444 U.S. 277 (1980) and **Maine vs. Thiboutot**, 448 U.S. 1 (1980) and Art. VI, § 13 of the Constitution of the State of New Mexico.  This Court has original jurisdiction over Plaintiff's state law claims pursuant to NMSA 1978, § 41-4-18(A).

10.    Venue is properly laid in this district pursuant to NMSA 1978, § 38-3-1(A) and § 41-4-18(B).

11.    All of the acts complained of herein which constitute the basis for liability against Defendants come within the scope of the waiver of immunity contained within the New Mexico Tort Claims Act, NMSA 1978 § 41-4-12.

12.    Plaintiff has given written notice of the claims contained herein against

-5-

Defendants in compliance with the requirements of the New Mexico Tort Claims Act, NMSA 1978 § 41-4-16.

## FACTS COMMON TO ALL CAUSES OF ACTION

13.     On Tuesday, February 4, 2003, Beck and Coriz were on-duty, uniformed members of the Santa Fe County Sheriff's Department. Each was operating a separate, marked sheriff's vehicle owned by Santa Fe County.

14.     As of February 4, 2003, David Sisneros resided with his wife, Amanda, and his step-children, Bryhanna and Stephen Martinez, at 22 Rancho de Siesta, Santa Fe County, New Mexico. From adolescence, David Sisneros suffered from periodic bouts of anxiety and depression for which he received treatment.

15.     For a few days prior to February 4, 2003, David Sisneros had been suffering from depression. On the evening of February 3, 2003, he and Amanda had argued about bills and other matters. On the morning of February 4, 2003, Amanda left for work before David Sisneros woke up. She left behind a note suggesting that they needed some time apart, asking him to leave the house, and stating that, if he didn't, she would take the kids and leave for awhile.

16.     Amanda came home from work at about 2:00 p.m. on February 4, 2003 and noticed that David Sisneros' car was still parked there. She went to her mother's house, located nearby, to pick up her children. She called their home from her mother's house several times, but David Sisneros did not answer. Amanda then went to their home to get clothing for her daughter. When she arrived at the house, David Sisneros was still in bed

-6-

and had not packed to leave. He seemed groggy and Amanda became concerned that he might have taken too much medication. She searched in the kitchen and found an empty Ibuprofen bottle in the garbage can, but she could not determine how many he might have taken.

17.     Because of her concern for David Sisneros' well-being, Amanda went next door to her grandmother's house, which is connected to their house. From there she called David Sisneros' mother, described the situation and explained her concerns. David Sisneros' mother, Kathleen, told Amanda that she would come over as soon as her husband, Al, came home from work. Amanda then returned to their house and found David Sisneros packing his clothes and speaking on the phone with a friend from El Paso with whom he was making arrangements to stay. Amanda then returned to her grandmother's house while David Sisneros continued packing.

18.     Shortly after 7:00 p.m., Amanda talked with her brother, Alfredo Leyba (known as "Fred"), who was in his car at the time, and described the situation. She also called her friend, April Garcia, who agreed to come over to provide emotional support for Amanda. Fred arrived at the residence shortly after 7:00 p.m.

19.     At that point, Fred and Amanda went over to the house to talk with David Sisneros. Fred emphasized to David that Amanda just wanted him to leave for awhile so things could settle down and they could then talk and work things out. David Sisneros responded that it was his house, too, and he didn't want to leave because he was in love with Amanda and the kids. At this point, Fred told David Sisneros that he was going to

-7-

call the police to have them escort him out. Fred left, went to his grandmother's house and called the 911 operator at approximately 7:14 p.m.

20.    During this conversation, Fred (who did not own or have any authority over the residence at 22 Rancho de Siesta) told the Santa Fe 911 operator that he wanted an officer sent to the house to assist in removing David Sisneros. He told the operator that David Sisneros had mental problems and was a threat to himself as well as to Fred's family. He told the operator that he (Fred) didn't live there, that the house belonged to his grandmother and that David Sisneros suffered from manic depression. The dispatcher got directions to the house and agreed to send somebody out there.

21.    The dispatcher then contacted Beck, who was on duty and patrolling elsewhere in Santa Fe County. The dispatcher told Beck that there was a problem with a mentally ill individual, possibly named "Juan Montoya." The dispatcher indicated that she didn't know if the individual was Juan Montoya or not and told Deputy Beck that Alfredo Leyba had called, was having a problem with a tenant who had a history of mental problems, had threatened the family in the past, and who lived in a duplex apartment. Beck indicated that he would respond.

22.    Shortly thereafter, April Garcia arrived, followed by David's parents, Al and Kathleen Sisneros. Al, Kathleen, Fred and April all went to David's house and opened the door. When they opened it, they noticed that David Sisneros was sitting on the couch in the living room next to the front door and that he had a kitchen knife in his hand. David Sisneros attempted to close the door and refused to talk with any of them. He said

-8-

that he needed time alone and that he didn't want to talk to anybody at that point. Al and Fred forced the door open and Al attempted to hold David Sisneros to calm him down. David Sisneros was holding the knife downward and to the rear. He never threatened anyone with the knife or attempted to use it. He demanded to be left alone and Fred attempted to separate David Sisneros from his father. At no time did David Sisneros attempt to hurt his father or Fred or anyone else, or offer any resistence.

23.     Amanda was not present during this encounter, but April Garcia came to Amanda's grandmother's house and described what she believed was going on. Amanda became concerned that one of them might accidentally hurt the other and called the 911 dispatcher.

24.     During this conversation, Amanda told the 911 dispatcher that someone had called about twenty minutes earlier but that nobody had showed up yet. She said that, although she had not witnessed it herself, a friend had told her that her husband was making a disturbance at their residence, had a knife, and was threatening to stab people or himself. She also indicated that he had taken some Ibuprofen. She told the dispatcher that she was at her grandmother's house, next door, but that her brother and David Sisneros' father were at David Sisneros' house and they were struggling to take the knife away from him. The dispatcher responded that an officer should be there fairly soon.

25.     The dispatcher then contacted Beck and told him that David Sisneros, a mentally ill subject, was threatening the family with a knife. She told Beck that they were physically fighting, trying to get the knife away from the subject.

-9-

26.    Beck received assistance from Coriz in responding to the call. Coriz had a trained police dog in his vehicle with him. Such animals are specifically trained to control armed suspects, including those armed with a knife.

27.    Beck and Coriz initially had a difficult time locating the residence but arrived at approximately 7:47 p.m. and parked their cars outside David Sisneros' home. At this point, Amanda, April and Fred were all standing in the area near or outside the gate to David Sisneros' residence. David's father, Al, was standing just outside the front door of the residence. David's mother, Kathleen, was seated on the edge of the couch just inside the front door of the residence.

28.    At the time the officers arrived, there was no disturbance taking place. David Sisneros had gone to his bedroom in the rear of his house, had left the bedroom briefly to go to the bathroom, and had then returned to the bedroom. No one else was in that part of the house.

29.    Immediately upon arriving at the residence, Beck got out of his vehicle with his gun drawn and his laser sight activated. Coriz took slightly longer because he had to get his dog out of the car.

30.    Beck conducted no investigation, made no inquiries, made no attempt to consult with Coriz or to coordinate a plan of action. Instead, he approached David Sisneros' residence in an aggressive manner. He brushed passed everyone there without asking any questions. Coriz asked April and Amanda where David Sisneros was, and they responded that he was in his room. Beck then asked whether he still had a knife, and they

responded that they did not know.

31.    As Beck and Coriz approached the house with their guns drawn, Al told them, "You don't need the gun. At least let me talk to my son. Let my wife talk to my son. You don't need the gun." He estimates that he repeated this four or five times. Beck and Coriz paid no attention to it. Instead, they ordered Al to get out of the way, ordered Kathleen to leave the premises and entered the house.

32.    Beck entered the house first, immediately proceeded down the hallway, and positioned himself outside the rear bedroom with his gun aimed at David Sisneros. Coriz stopped in the living room area with his dog.

33.    Despite the availability of less than lethal force options, including using (or at least showing) the police dog, chemical weapons, or batons--all of which were readily available--Beck chose to leave the dog with Coriz in the living room and to not avail himself of any of the other options. He never considered other well-established law enforcement techniques, including tactical retreat, the use of cover, distance or back up assistance. Instead, he chose to initiate a total unnecessary face-to-face confrontation.

34.    Beck, who was wearing body armor under his uniform and was virtually invulnerable to attack, immediately adopted a highly confrontational tone and began yelling at David Sisneros to "Drop the knife." He repeated this two or three times and then immediately fired three shots in rapid succession, fatally wounding David Sisneros, who fell to the floor near a bookcase against the rear wall of the bedroom. Two of the bullets passed through David Sisneros and lodged in the rear wall near a bookcase. Each

-11-

of the three shots was inevitably fatal.

35.     After shooting David Sisneros, Beck kept his gun aimed at David Sisneros'

body, made no attempt to ascertain his injuries or condition, and did not allow anyone else

to approach David Sisneros or to render aid.  David Sisneros bled to death on the floor in

his own bedroom.

36.     At the time that they entered David Sisneros' home, Beck and Coriz had

A.     No arrest warrant;

B.     No search warrant;

C.     No consent to enter the home;

D.     No evidence of any exigent circumstances;

E.     No justification based upon hot pursuit;

F.     No probable cause that a crime had been committed by David

Sisneros;

G.     No basis for believing that any evidence or contraband was about to

be destroyed or otherwise disposed of;

H.     No evidence that David Sisneros was attempting to flee; and

I.     No evidence that David Sisneros was armed or posed any threat to

any individual.

37.     Despite this, Beck and Coriz chose to make an illegal and unnecessary entry

into David Sisneros' home which, in and of itself, violated David Sisneros' rights and

which provoked an unnecessary escalation in the level of tension and danger.  The conduct

-12-

of Beck and Coriz in entering the home and confronting David Sisneros was in direct contravention of proper police procedures and without any legal or legitimate law enforcement justification.

38.     Neither Beck nor Coriz conducted any meaningful investigation. Had they done so, they would have known that there was no need to confront David Sisneros, no need to escalate the situation, and no need to place themselves in a position in which they believed that they were in danger.

39.     At all times material hereto, Coriz was in a position of safety in the living room of the residence. Beck was also in a position of safety as he was standing outside of the bedroom and was capable of safely retreating had he chosen to do so.

40.     At no time did David Sisneros attack or assault either Beck or Coriz nor did he present any threat of harm to either of them--particularly in light of his position in the bedroom.

41.     At the time of the shooting, David Sisneros did not pose an immediate threat to the safety of Beck, Coriz or any other person.

42.     At the time of the shooting, David Sisneros was not actively resisting arrest or attempting to evade arrest by flight.

43.     At the time of the shooting, there were no criminal charges pending against David Sisneros, no warrants for his arrest, and no probable cause to believe that a violation of any law had occurred.

44.     The conduct of Beck and Coriz was unreasonable and without any legal

justification. Neither Beck nor Coriz acted in self defense, and neither acted in defense of another. Neither Beck nor Coriz gave any warning nor fired a warning shot before fatally wounding David Sisneros.

45.     Evidence regarding the shooting of David Sisneros was presented to the Santa Fe County Grand Jury which, on May 15, 2003, returned a finding that the shooting was not justified.

## FIRST CAUSE OF ACTION

### (Claims Against Beck and Coriz Under 42 U.S.C. § 1983)

46.     The contents of paragraphs 1 through 45, above, are incorporated hereinto by reference as if set forth in full.

47.     Beck and Coriz had a duty to refrain from violating David Sisneros' constitutional rights and to prevent one another from violating those rights.

48.     Beck and Coriz had a duty to refrain from engaging in reckless or deliberate conduct during the seizure of David Sisneros which would unreasonably create the need for them to use deadly force.

49.     The conduct of Beck and Coriz, described above, constituted an illegal search of David Sisneros' home and constituted unreasonable, unnecessary and unjustified use of excessive force against David Sisneros. This conduct deprived David Sisneros of his rights guaranteed under the Fourth Amendment to the United States Constitution to be free from illegal searches of his residence and to be free from unreasonable and illegal seizures of the person, as well as to be free from the application of unreasonable and

-14-

excessive force in connection with such seizures.

50.    The conduct of Beck and Coriz was intentional, unreasonable, reckless, wanton, wilful and callously indifferent to the rights of the public, including David Sisneros.

51.    The constitutional rights violated by Beck and Coriz were clearly established prior to February 4, 2003, and any reasonable law enforcement officer would have been aware that the conduct of Beck and Coriz, as described herein, would violate David Sisneros' constitutional rights.

52.    More specifically, as of February 4, 2003, it was clearly established that a person has the right under the Fourth Amendment to be free from illegal and warrantless searches of his home as well as to be free from unreasonable seizures of his person, including the right to be free from the use of excessive force to effect an arrest, viewed in the light of the severity of the alleged crime, any immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight.

53.    Because the illegal entry into David Sisneros' home violated his Fourth Amendment rights, all harm proximately caused by the illegal entry, including the shooting death of David Sisneros, constitutes damages proximately caused by the violation of David Sisneros' Fourth Amendment right to be free from unreasonable searches.

54.    Because Beck and Coriz had no probable cause to believe that David Sisneros had committed any crime, let alone a serious crime; because Beck and Coriz

-15-

could not have reasonably believed that David Sisneros presented a threat to their safety or the safety of others; and because Beck and Coriz could not have reasonably believed that David Sisneros was actively resisting arrest or attempting to evade arrest by flight, Beck and Coriz's conduct violated David Sisneros' clearly established Fourth Amendment rights, and any reasonable law enforcement officer would have know that the illegal entry into the home and the use of deadly force on David Sisneros under the circumstances would have violated his rights.

55. The conduct of Beck and Coriz, described above, was a direct and proximate cause of the deprivation of David Sisneros' clearly established Fourth Amendment rights as well as the resultant injuries and damages, described below.

## SECOND CAUSE OF ACTION

### (Claims Against Coriz for Failure to Prevent Deprivation of Constitutional Rights Under 42 U.S.C. § 1983)

56. The contents of paragraphs 1 through 55, above, are incorporated hereinto by reference as if set forth in full.

57. Coriz had a duty to take reasonable measures to make sure that Beck acted in accordance with policies, procedures and protocols of the Santa Fe County Sheriff's Department and to refrain from depriving David Sisneros of his constitutional rights. Coriz breached his duty by actively encouraging Beck and by failing to prevent Beck from illegally entering the premises and using unreasonable, unnecessary and excessive force against David Sisneros. The conduct of Coriz, described above, was intentional, unreasonable, reckless, wanton, wilful, and/or callously indifferent to the rights of the

-16-

public, including David Sisneros.

58.     The conduct of Coriz, described above, was a direct and proximate cause of the deprivation of David Sisneros' clearly established Fourth Amendment rights as well as the resultant injuries and damages, described below.

### THIRD CAUSE OF ACTION

### (Claims Against Montaño, Ray Sisneros and Solano for Supervisory Liability Under 42 U.S.C. § 1983)

59.     The contents of paragraphs 1 through 58, above, are incorporated hereinto by reference as if set forth in full.

60.     Montaño, Ray Sisneros and Solano (hereinafter collectively referred to as "the Sheriffs"), during their respective tenures as Santa Fe County Sheriff, had a duty to exercise due care in the supervision of officers of the Santa Fe County Sheriff's Department, including Beck and Coriz.  In addition, the Sheriffs had a duty to properly screen, hire, train, monitor, supervise and/or discipline subordinate law enforcement employees of the Santa Fe County Sheriff's Department, including Beck and Coriz.  The Sheriffs had a further duty to insure that officers of the Santa Fe County Sheriff's Department were properly equipped with necessary equipment to perform their duties without causing unnecessary harm to citizens.  As part of that responsibility, the Sheriffs had a duty to:

       A.     Conduct a reasonable and adequate applicant screening process, including background investigations, to determine whether applicants for employment with the Santa Fe County Sheriff's Department were appropriately

-17-

qualified and had the appropriate temperament and psychological status to act as professional law enforcement officers;

B.     Assure that subordinate law enforcement officers of the Santa Fe County Sheriff's Department received appropriate and adequate training, including at a minimum the amounts required by law, prior to performing duties as law enforcement officers;

C.     Prepare, adopt and inculcate appropriate policies, procedures and protocols regarding the performance of law enforcement functions by officers of the Santa Fe County Sheriff's Department, including Beck and Coriz, concerning, among other things, responses to 911 calls, the legal requirements for entry into private property, dealing with emotionally-disturbed and/or barricaded persons, the use of force, the use of deadly force, and the duty to prevent deprivation of rights by fellow officers;

D.     Monitor and/or discipline subordinate law enforcement employees of the Santa Fe County Sheriff's Department, including Beck and Coriz, in order to assure that officers complied with departmental policies, procedures and protocols; and

E.     Assure that subordinate officers of the Santa Fe County Sheriff's Department were properly equipped with options for use of less-than-lethal force in appropriate circumstances.

61.     Prior to February 4, 2003, the Sheriffs knew or reasonably should have

-18-

known that law enforcement officers of the Santa Fe County Sheriff's Department, including Beck and Coriz, were acting improperly and violating citizen's constitutional rights. The Sheriffs knew or reasonably should have known that subordinate officers of the Santa Fe County Sheriff's Department lacked adequate training and certification, were operating without knowledge of or in flagrant disregard for departmental policies, procedures and protocols in connection with the use of force, the use of deadly force and the duty to prevent deprivations of rights by other officers, and were not adequately equipped with options for use of less than lethal force.

62.     In particular, the Sheriffs knew or reasonably should have known that Beck had been the subject of at least three prior citizen's complaints and lawsuits alleging the use of excessive force, including an incident involving Frank Coppler which occurred on January 15, 1997, an incident involving Rudy Gonzales which occurred on August 23, 1998 and an incident involving Monica Vigil which occurred on February 13, 1999. The Sheriffs also knew or reasonably should have known that Beck had been involved in other incidents which reflected negatively on his suitability for a career in law enforcement, including numerous complaints of the use of excessive force in his prior law enforcement employment, an incident involving Gary C. Montoya, a private citizen, which occurred on November 10, 2001 in which Beck threatened to use deadly force against Mr. Montoya in a dispute at an ATM machine in Española, as well as numerous other work-related incidents which resulted in suspensions and/or other disciplinary actions. All of these incidents occurred prior to the shooting of David Sisneros.

-19-

63.     The conduct of Beck and Coriz on February 4, 2003 was in direct violation of numerous policies and procedures of the Santa Fe County Sheriff's Department. However, despite such blatant and flagrant violations, no disciplinary action was taken by Solano against either Beck or Coriz. Instead, Beck was terminated from employment after the shooting of David Sisneros, ostensibly for his violation of departmental policies in connection with the November, 2001 Gary C. Montoya incident as well as for a second on-the-job incident which has not been publicly disclosed.

64.     The Sheriffs breached the foregoing duties by failing to adopt or enforce appropriate policies, procedures and protocols as well as by failing to properly screen, hire, train, monitor, supervise and/or discipline officers of the Santa Fe County Sheriff's Department, including Beck and Coriz. In particular, the Sheriffs failed to properly screen and hire deputies, failed to adopt proper policies, procedures and protocols, failed to implement appropriate training, failed to appropriately discipline subordinate officers, and failed to take other appropriate supervisory actions which would have prevented the deprivation of the clearly established constitutional rights of David Sisneros.

65.     The conduct of the Sheriffs, described above, was intentional, reckless, wanton, wilful and/or callously indifferent to the rights of the public, including David Sisneros.

66.     The conduct of the Sheriffs, described above, was a direct and proximate cause of the deprivation of the clearly established Fourth Amendment rights of David Sisneros as well as the resultant injuries and damages, described below.

## FOURTH CAUSE OF ACTION

### (Claims Against Solano and/or Santa Fe County Under 42 U.S.C. § 1983)

67.     The contents of paragraphs 1 through 66, above, are incorporated hereinto by reference as if set forth in full.

68.     Santa Fe County delegated to the Sheriffs the authority to operate the Santa Fe County Sheriff's Department and to screen, hire, train, monitor, supervise and/or discipline subordinate law enforcement employees of the Santa Fe County Sheriff's Department, including Beck and Coriz. The Sheriffs were delegated the responsibility of being the final decision-makers and official policy-makers for Santa Fe County in the area of law enforcement activities. The actions of the Sheriffs constituted the official and informal customs, policies and practices of Santa Fe County in the area of law enforcement.

69.     Solano and/or Santa Fe County maintained within the Sheriff's Department a custom or policy which exhibited deliberate indifference to the constitutional rights of citizens, which permitted or condoned deviations from official policies, procedures and protocols of the Santa Fe County Sheriff's Department, and which permitted or condoned the deprivation of constitutional rights, including the right to be free from illegal searches and seizures, the right to be free from unreasonable, excessive and deadly force, and the right to be free from the failure of law enforcement officers to prevent the deprivation of rights by their fellow officers.

70.     It was the policy and/or custom of Solano and/or Santa Fe County to

-21-

inadequately and improperly investigate complaints of police misconduct, and acts of misconduct were, instead, ratified, condoned and encouraged by Santa Fe County.

71.    The Sheriffs, as the decision-makers and official policy-makers for Santa Fe County, were confronted with an obvious need to properly screen, hire and train Santa Fe County law enforcement officers, and particularly Beck and Coriz, to avoid the violation of constitutional rights of citizens, including David Sisneros.

72.    The training and supervisory deficiencies of Solano and/or Santa Fe County, identified above, were closely related to the ultimate injuries to David Sisneros and were a proximate cause of those injuries.

73.    Santa Fe County conducted an inadequate and inappropriate investigation into the conduct of Beck and Coriz which wrongfully cleared them of all wrong-doing. This failure to properly investigate and take appropriate disciplinary action constituted a ratification by Solano and /or Santa Fe County of the deprivation of the constitutional rights of David Sisneros by Beck and Coriz.

74.    The conduct of Solano and/or Santa Fe County, as demonstrated by the actions of the Sheriffs and the informal customs and policies, described above, was a direct and proximate cause of the deprivation of the clearly established Fourth Amendment rights of David Sisneros as well as the resultant injuries and damages, described below.

## FIFTH CAUSE OF ACTION

### (Claims Against Beck and Coriz Under the Tort Claims Act)

75.     The contents of paragraphs 1 through 74, above, are incorporated hereinto by reference as if set forth in full.

76.     Beck and Coriz, as law enforcement officers, had the duty in any activity actually undertaken by them to exercise for the safety of others that care ordinarily exercised by a reasonable, prudent and qualified law enforcement officer in the light of the nature of what was being done.

77.     Beck and Coriz breached their duty by engaging in an illegal search of the premises belonging to David Sisneros, by using unreasonable, unnecessary and unjustified excessive and deadly force, and by failing to prevent the deprivation of rights by their fellow officers.

78.     The conduct of Beck and Coriz, described above, resulted in personal injury, bodily injury and wrongful death to David Sisneros resulting from assault, battery, false imprisonment, false arrest and/or deprivation of rights, privileges or immunities secured by the Constitution and laws of the United States and New Mexico.

79.     The conduct of Beck and Coriz, described above, resulted in personal injury and/or bodily injury to Amanda Sisneros, individually, as the result of negligent infliction of emotional distress.

80.     The conduct of Beck and Coriz, described above, resulted in personal injury and/or bodily injury to Amanda Sisneros, Bryhanna Martinez and Stephen Martinez as the

-23-

result of their loss of consortium with David Sisneros

81.     The conduct of Beck and Coriz, described above, was a direct and proximate cause of the damages to David Sisneros set forth below.

## SIXTH CAUSE OF ACTION

## (Claims Against the Sheriffs for Supervisory Liability Under the Tort Claims Act)

82.     The contents of paragraphs 1 through 81, above, are incorporated hereinto by reference as if set forth in full.

83.     During their respective terms of office, the Sheriffs had the duty in any activity actually undertaken by them to exercise for the safety of others that care ordinarily exercised by a reasonable, prudent and qualified sheriff in the light of what was being done.  As part of that responsibility, the Sheriffs had a duty to take those actions set forth in paragraph 60, above.

84.     Prior to February 4, 2003, and during their respective terms of office, the Sheriffs knew or reasonably should have known of those matters set forth in paragraphs 61-62, above.

85.     The Sheriffs breached the foregoing duties by failing to properly screen, hire, train, monitor, supervise and/or discipline law enforcement officers of the Santa Fe County Sheriff's Department, including Beck and Coriz.  The Sheriffs further breached their duties by failing to adopt and enforce appropriate policies, procedures and protocols, by failing to implement appropriate supplemental training, by failing to appropriately discipline subordinate officers of the Santa Fe County Sheriff's Department, by failing to

-24-

provide subordinate officers with adequate less-than-lethal force options, and by failing to take other appropriate and reasonable supervisory actions to correct the problems and prevent the harm which resulted to David Sisneros as a result of the misconduct of Beck and Coriz, described above.

86.   The conduct of the Sheriffs, described above, resulted in personal injury, bodily injury and wrongful death to David Sisneros resulting from assault, battery, false imprisonment, false arrest and/or the deprivation of rights, privileges or immunities secured by the Constitution and laws of the United States and New Mexico.

87.   The conduct of the Sheriffs, described above, was a direct and proximate cause of the injuries and damages to David Sisneros, set forth below.

## SEVENTH CAUSE OF ACTION

### (Claims Against Solano and/or Santa Fe County Under the Tort Claims Act)

88.   The contents of paragraphs 1 through 87, above, are incorporated hereinto by reference as if set forth in full.

89.   Solano and/or Santa Fe County was the governmental entity which had immediate supervisory responsibility over the actions of law enforcement employees of Santa Fe County, including Beck, Coriz and the Sheriffs. Therefore, Solano and/or Santa Fe County are jointly and severally liable for all injuries and damages caused by the actions of their officials and/or employees pursuant to the doctrine of vicarious liability.

## DAMAGES

90.   The contents of paragraphs 1 through 89, above, are incorporated hereinto

by reference as if set forth in full.

91.    As a direct and proximate result of the conduct of Defendants, described above, the Estate of David Sisneros, as represented by its personal representative, is entitled to recover damages against Defendants as follows:

A.    David Sisneros endured intense physical pain and suffering, emotional distress and psychological fear during the course of the incident described above and up until the time of his death. Therefore, the Estate of David Sisneros is entitled to recover damages in an amount to be determined at the trial of this cause.

B.    The Estate of David Sisneros has lost the present worth of the life of its decedent to his estate, including his enjoyment of life, having regard to the aggravating circumstances attending the wrongful and unlawful acts which resulted in his death, as provided for and as amplified under New Mexico and federal law. Such damages include hedonic damages for the value of the loss of life itself, as well as economic damages, including impairment to lifetime earning capacity and loss of household services. Therefore, the Estate of David Sisneros is entitled to recover damages in an amount to be determined at the trial of this cause.

C.    The Estate of David Sisneros has lost the value of the guidance and counseling which would have otherwise been provided by David Sisneros to Justice Vasquez, Bryhanna Martinez and Stephen Martinez. Therefore, the Estate of David Sisneros is entitled to recover damages in an amount to be determined at

the trial of this cause.

> D.    The Estate of David Sisneros has incurred reasonable and necessary expenses for his funeral and burial expenses, as well as for necessary repairs to the walls and carpet in the area where David Sisneros was shot. Therefore, the Estate of David Sisneros is entitled to recover special damages in the amount of at least $9,858.00.

As a result of the negligent infliction of emotional distress, Amanda Sisneros, individually, is entitled to recover an award of compensatory damages against Defendants pursuant to her claims under the New Mexico Tor Claims Act in an amount to be proven at the trial of this cause.

92.    As a result of their loss of consortium with David Sisneros, Amanda Sisneros, individually, Bryhanna Martinez and Stephen Martinez are each entitled to recover an award of compensatory damages against Defendants pursuant to their claims under the New Mexico Tort Claims Act in amounts to be proven at the trial of this cause.

93.    Because the conduct of Beck, Coriz, Montaño, Ray Sisneros and/or Solano involved intentional misconduct, recklessness, gross negligence, wilfulness and/or callous indifference to David Sisneros' rights, and/or because those Defendants' conduct was motivated by malice, evil motive or intent, the Estate of David Sisneros is entitled to recover a separate award of punitive and exemplary damages against each of these Defendants under Plaintiff's § 1983 claims in amounts to be determined at the trial of this cause.

-27-

WHEREFORE, Plaintiff requests the following relief against Defendants:

A.     Awards of compensatory damages as set forth above;

B.     Awards of punitive damages against Defendants Beck, Coriz, Montaño, Ray Sisneros and/or Solano under the §1983 claims only, as set forth above;

C.     An award of pre- and post-judgment interest on any amounts recovered herein;

D.     Their costs of action herein, including attorneys' fees on Plaintiff's §1983 claims, pursuant to Title 42 U.S.C. §1988; and

E.     Such other and further relief as the court may deem appropriate under the circumstances.

Respectfully submitted,

ROTHSTEIN, DONATELLI, HUGHES,
DAHLSTROM & SCHOENBURG, LLP

By: _____
Robert R. Rothstein
Mark H. Donatelli
1215 Paseo de Peralta
Post Office Box 8180
Santa Fe, NM 87504-8180
(505) 988-8004

Attorneys for Plaintiff Amanda Sisneros

S Bob 5862 Plead Complaint.wpd

-28-